IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| THOMAS BROWN, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Civil Action No. 7:08CV00521 |
| ) | |
| NIPPER AUTO PARTS AND ) | |
| SUPPLIES, INC., ) | |
| ) | |
| Defendant ) | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

### Statement of the Case

The plaintiff, Thomas Brown ("Brown"), filed this action seeking overtime compensation and liquidated damages under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq ("FLSA") on September 22, 2008, against Nipper Auto Parts and Supplies, Inc. ("Nipper Auto Parts"). The defendant answered by denying liability.

Nipper Auto Parts has moved for summary judgment. The defendant now submits this memorandum in support of its request for summary judgment.

### Statement of Facts

### Nipper Auto Parts

Nipper Auto Parts is a small business in rural Rich Creek, Virginia, owned by Roger Nipper ("Nipper") and his wife, Linda Nipper. (Nipper Dep., 6). The Giles County store, which was started in 1984 by Nipper's brother, sells automotive parts and supplies of all kinds. Since its inception in 1984, the store also has sold musical instruments and supplies. (Johnson Dep.,

35-36). The store's customer base consists of both individual and commercial establishments such as automotive garages.

The main source of the automotive parts sold by Nipper Auto Parts is NAPA Auto Parts ("NAPA"). But Nipper Auto Parts also distributes tire products and other items that NAPA does not manufacture. In the event that NAPA does not have in stock items needed by Nipper Auto Parts' customers, the store procures the merchandise in the market from other manufacturers. (Brown Dep., 43-44; Johnson Dep., 47-48).

Nipper is president of Nipper Auto Parts. Nipper is 65 years old with a high school education from Tazewell County, Virginia. (Nipper Dep., 53-54). Nipper has been married for 44 years to Linda Nipper, who works part time for the company as a bookkeeper.

Besides Nipper and his spouse, the corporation during the relevant time period had three employees: Jeffrey Jonson ("Johnson"), Harold Shultz ("Shultz") and Brown. Johnson is the store manager. Shultz's main duty is delivering parts and supplies to the store's commercial customers and cleaning the store. Brown was the assistant manager. (Johnson Dep., 50).

### Thomas Brown

Brown is a 46 year old with a high school education who has operated or owned an automobile repair business called JBS Garage in Peterstown, West Virginia, since the 1990's. Even while he worked for Nipper Auto Parts, Brown continued to run JBS Garage, which is a West Virginia S corporation.[1] (Brown Dep., 11-12; 14-20). Brown holds an Automotive Service Excellence Certification. (Brown Dep., 7).

---

[1] Ironically, Brown's son works more than 40 hours at JBS Garage repairing automobiles and receives an IRS W-2 form because he is an employee of that corporation, but is paid no overtime compensation by Brown. (Brown Dep., 18).

Brown worked for Nipper Auto Parts from November 2005 until July 2008. Throughout that period, Brown was paid on a salary basis. (Brown Dep., 23). Brown's starting salary was $460.00 each week. In April 2008 he received a raise to $480.00 a week. At no point during his employment did Brown suggest to anyone associated with Nipper Auto Parts that he was a nonexempt employee entitled to overtime compensation. (Brown Dep., 23-24).

Because Nipper Auto Parts is such a small retailer, the three managerial employees – Nipper, Johnson and Brown – worked as a team on a wide variety of tasks. (Nipper Dep., 25-26; Johnson Dep., 53-54). In many respects their duties overlapped. Each was assigned a "counterman number" so they could operate the cash register, place orders and print out invoices. (Johnson Rule 30(b)(6) Dep., 19). All three men had supervisory authority over Shultz, who was paid an hourly wage to deliver parts, clean the store bathroom and perform miscellaneous other jobs. (Shultz Dep., 5-6). Both Johnson and Brown were responsible for purchasing inventory from NAPA and other manufacturers. (Brown Dep., 43-44; Johnson Dep., 26-27).

Brown's operational responsibilities were diverse and included procuring on a weekly basis a sufficient supply of inner tubes for the store's shelves and placing orders for specific auto parts requested by customers. (Brown Dep., 48-49). Because Brown is a professional musician, he also oversaw the store's musical section. Brown made purchases with no direct supervision by either Nipper or Johnson. At the end of each business day, Brown counted the store's cash and made sure they matched the daily sales reports as Johnson shutdown the computer system. (Johnson Dep., 39-40).

Brown's hours fluctuated from one week to the next. (Brown Dep., 30). He usually worked in excess of 40 hours. He and Johnson arrived at about 7:15 a.m. and opened the store together at 7:30 a.m. During the work day, Brown was allowed to tend to a number of personal affairs, including preparing paperwork and bank deposits for JBS Garage; making occasional trips to West Virginia to assist his son on a repair job at JBS Garage; take his girlfriend's child to school in Narrows, Virginia; and work on his motorcycles and other hobbies with Johnson in the Nipper Auto Parts parking lot. (Brown Dep., 33-40; Johnson Dep., 53). When Brown's girlfriend was injured in a motorcycle accident, he took time off. (Brown Dep., 40). The store never docked his salary for any of these and other personal errands. (Brown Dep., 40-41).

Brown testified during his deposition that throughout his two and a half years with Nipper Auto Parts he had been under the impression that he was being groomed to take over the business as owner upon Nipper's approaching retirement. (Brown Dep., 26-27). In July 2008, however, Brown learned that Nipper had agreed to sell the business to Johnson instead. Promptly after making this discovery in July 2008, Brown quit without notice. Two months later Brown filed this suit claiming Nipper Auto Parts had willfully refused to pay him overtime compensation from November 2005 through the day he resigned in July 2008.

## Argument

### Standard of Review

Nipper Auto Parts moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. The defendant's motion is based on a statutory exemption from FLSA's overtime compensation requirements. 29 U.S.C. § 213(a)(1). In assessing Nipper Auto Parts' affirmative assertion of this exemption, the Court should resolve any material issues of fact in

4

Brown's favor as the nonmoving party. The Secretary of Labor's regulations implementing FLSA exemptions should be construed narrowly against Nipper Auto Parts, which bears the burden of proving Brown was not entitled to overtime compensation. Darveau v. Detecon, 515 F.3d 334, 337-38 (4th Cir. 2008).

## I. BROWN WAS EXEMPT AS AN ADMINISTRATIVE EMPLOYEE.

An administrative employee is exempt from FLSA if he meets the Secretary's three-part test.

> (1) the employee receives a salary of at least $455.00 per week;
>
> (2) the employee's primary duty is "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers;" and
>
> (3) the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."

29 C.F.R. § 541.200.[2]

The three-part test quoted above was promulgated in 2004, when the Secretary revised the Department of Labor's longstanding administrative exemption regulations. Prior to the 2004 amendments, an employee qualified for this exemption only if his primary duty related to "management *policies* and general business operations of the employer." The Secretary explained in the Preamble to the revised regulations that

---

[2] Nipper Auto Parts also relies in the alternative upon 29 C.F.R. 541.708, which deems an employee exempt if his primary duty includes both administrative and executive activities. The defendant concedes, however, that Brown did not supervise two or more subordinates, which is a requirement for the executive exemption.

> while management policies are one component of management, there are many other administrative functions that support managing a business. . . . [E]xempt administrative work includes not only those who participate in the formulation of management policies or in the operation of the business as a whole, but it also includes a wide variety of persons who either carry out major assignments in conducting the operations of the business, or whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business.

(69 Fed. Reg. 22, 138, April 23, 2004).

Under both the current and pre-2004 regulations, a person whose primary duty is limited to merely selling a product at the retail level ordinarily does not qualify for the administrative exemption. 29 C.F.R. § 541.201(a) ("To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."). This language in subsection (a) of 29 C.F.R. § 541.201 does not mean, however, that employees whose job duties *include* selling products for retailers necessarily fail to qualify for the administrative exemption. Individuals whose jobs involve purchasing inventory for retailers often are exempt. Subsection (b) of the regulation makes this plain.

> Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as . . . quality control; purchasing; procurement; . . . and similar activities.

29 C.F.R. § 541.201(b).

The regulation just quoted makes clear that purchasing and procuring activities on behalf of an employer are deemed "directly related to management or general operations of the business." The Secretary returns to this point elsewhere in the FLSA regulatory scheme. In 29

C.F.R. § 541.203 the Secretary provides a nonexhaustive list of administrative exemption examples, one of which is an employee who makes purchases for his employer.

> . . . (f) Purchasing agents with authority to bind the company on significant purchases generally meet the duties requirements for the administrative exemption even if they must consult with top management officials when making a purchase commitment for raw materials in excess of the contemplated plant needs.

29 C.F.R. § 541.203.

Similarly, in 29 C.F.R.§ 541.700(c), the Secretary explains that "ordering merchandise" is an exempt activity in a retail establishment.

> Thus, for example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, *ordering merchandise*, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. . . .

29 C.F.R. § 541.700(c).

The regulations cited above stand for two propositions that are important in the case at bar. First, an employee whose only duty is to make retail sales behind a cash register does not engage in exempt work. Second, an employee whose primary duty includes "purchasing," "procuring" or "ordering merchandise" is engaged in exempt activity. 29 C.F.R. §§ 541.201(b); 541.203; 541.700(c); and 541.708.

These principles were applied correctly by the United States District Court for the District of Maryland in Stricker v. Eastern Off Road Equipment, 935 F.Supp. 650 (D. Md. 1996). There, the plaintiff, Stricker, worked for Eastern Off Road Equipment, a retailer of truck and off-road equipment. Stricker's job title was "store manager" and his duties included making sales as well as managing inventory and routine upkeep of one of Eastern Off Road's

7

several retail locations. Id. at 652. Stricker later sued Eastern Off Road claiming that despite his job title and position description he was actually a "salesman, a stock boy, a janitor, [and] a clerical worker." Id. at 653.

The district court began its analysis by finding that Stricker did not qualify for the executive employee exemption because he did not fulfill the regulatory requirement that he supervise two or more employees. Id. at 654. See 29 C.F.R. § 541.100 (executive employee is one who "customarily and regularly directs the work of two or more other employees."). Nonetheless, the court concluded that Eastern Off Road had properly classified Stricker as exempt because his job functions both related directly to the store's general operations and involved sufficient discretion. "Either alone, or with a co-manager, the plaintiff was responsible for the 'day-to-day operations' of the store," the court observed. *Stricker*, 935 F.Supp. at 659. Stricker's area manager would also visit the store on occasion. Id. at 657, n. 6. For a five month period during Stricker's employment, the plaintiff had had supervisory authority over an assistant. Id. at 657. Beyond that interlude, Stricker did not supervise anyone.

Stricker's job duties ranged from opening the store in the morning, running and balancing the cash register and placing both routine and special inventory orders. Id. at 657 ("When a customer requested merchandise that Eastern Off Road did not supply, the plaintiff had the authority to special-order the item from companies other than Eastern Off Road."). In finding that Stricker's duties related directly to the store's business operations, the court emphasized that the Secretary's regulations

> . . . provide that one whose duties include purchasing for a retail business may also be an administrative employee if that work is of substantial importance to the management or operation of the business.

*Stricker*, 650 F.Supp. at 656 citing 29 C.F.R. § 541.205(c)(3) and (4).

Stricker's primary duty also satisfied the discretion and independent judgment prong of the Secretary's three-part test, the court held. Stricker's " . . . work involving procurement of inventory, particularly special orders" and other duties satisfied the discretion and independent judgment element because they " . . . all involve matters which commit Eastern Off Road 'in substantial respects financially and otherwise.' " *Stricker*, 650 F.Supp. at 657 [internal quotations omitted]. Because Stricker's primary duties were administrative, the court granted Eastern Off Road's motion for summary judgment. Id. at 658.

The Court should grant summary judgment to Nipper Auto Parts for many of the same reasons the court in *Stricker*, at id., granted the employer there summary judgment. Like Stricker, Brown's primary duty related directly to management or the general business operations of the store owner. 29 C.F.R. § 541.201(a).[3] Brown's duties included procuring and purchasing "anything related to the business" on behalf of Nipper Auto Parts on a daily basis. (Brown Dep., 50).

Brown implemented the store's purchasing policy with no direct supervision. The store's policy was to order inventory preferentially from NAPA. (Johnson Dep., 47-48). Often,

---

[3] Actually, Brown's job duties related even more directly and substantially to his employer's management and general business operations. Stricker worked for a much larger employer than did Brown. Stricker was employed in only one of Eastern Off Road's many retail stores. Brown worked in the sole store owned and operated by Nipper Auto Parts. Additionally, Brown supervised Shultz for more than two and a half years. Stricker, in contrast, had supervisory authority over a subordinate for just five months. During the remainder of Stricker's employment, he had no subordinates.

however, NAPA would not supply a particular type of merchandise. In that event, Brown, acting as the store's purchasing agent, would search the market for another parts dealer. Brown had authority to purchase that inventory from whichever dealer he found to supply the part. (Brown Dep., 43-44; Nipper Dep., 57-58). Brown explained during his deposition that he could choose from sources of supply besides NAPA. (Brown Dep., 44). Brown shopped the price offered by a supplier if he thought it was too high. (Brown Dep., 47; Nipper Dep., 27-28). Procuring and purchasing inventory was an important part of Brown's job on a regular basis.

> Q. So that was a regular part of your job, ordering?
>
> Brown. Yes.

(Brown Dep., 45).

Significantly, Brown had authority to make these inventory purchases on behalf of Nipper Auto Parts with no direct supervision from either Johnson or Nipper.

> Q. But when your people called in and wanted something and you placed the orders, you wouldn't go to Jeff and Roger and get permission, you just did it?
>
> Brown. We wouldn't need to. We were instructed on how to do that in the beginning and we all know where to go for what.
>
> Q. But you wouldn't have to get their permission to buy it?
>
> Brown. Right.

(Brown Dep., 46; see Johnson Dep., 52 and Nipper Dep., 60).

Purchasing inventory was such a central part of Brown's job that at his deposition he was unable even to estimate the total number of orders he placed during an average day.

> Q. How many orders a day did you place?
>
> Brown. I wouldn't have any way of guessing that.

> Q. A lot?
>
> Brown. A lot.

(Brown Dep., 47-48).

While many of Brown's purchases of inventory were related to specific customers (or "special orders"), he also made routine inventory orders of certain merchandise on a regular basis. Brown for example was largely responsible for ensuring that the store was sufficiently stocked with tire products. (Brown Dep., 49). Brown called American Tire and other suppliers to make inventory purchases on such a routine basis that he could recognize the service representatives there by the sounds of their voices.

> Q. . . . did you generally know the service representative that answered the phone?
>
> Brown. Sometimes. I mean, I don't know any of them personally. Just by constant daily phone conversations, yes.
>
> . . .
>
> Q. How many packages [of inner tubes] would you ask for for a given week?
>
> Brown. Depends on what we sold the previous week.
>
> Q. So you would just check and see what it looked like that you needed?
>
> Brown. The computer, yes. We would check the sales.
>
> Q. That was part of your job?
>
> Brown. Yes.

(Brown Dep., 49).

Brown was also responsible for overseeing and procuring music supplies. Nipper Auto Parts has complemented its automotive business with musical merchandised since the store opened in 1984. While the volume of these sales is small, the store has regular customers who purchase musical supplies alone or in combination with purchases of automotive parts. (Johnson Dep., 35-36). Because Brown is a professional musician, he was delegated broad authority to acquire inventory and run this segment of the store. (Brown Dep., 51-53; Johnson Dep., 13-15).

Brown's active and continuous exercise of procurement authority over the course of his employment clearly represents discretion and independent judgment within the Secretary's definition of those terms. In 29 C.F.R. § 541.202(b), the Secretary provides a nonexclusive list of factors that are relevant in determining whether an employee exercises "discretion and independent judgment." These include,

> [W]hether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; . . . whether the employee has authority to negotiate and bind the company on significant matters; . . . .

29 C.F.R. § 541.202(b).

In the Preamble to the revised regulations in 2004, the Secretary observed (referring to the list of factors just quoted), "Federal courts generally find that employees who meet at least two or three of these factors are exercising discretion and independent judgment." (69 Fed. Reg. 22, 143, April 23, 2004).

These relevant factors (among others) establish that Brown exercised discretion and independent judgment. He plainly "implemented" and "carried out" Nipper Auto Parts' purchasing policies and "operating practices." (Brown Dep., 42-43; Johnson Dep., 47-48); see 29 C.F.R. § 541.202(b). Brown's assignment to make special and routine procurements of inventory on a daily basis was a "major assignment," particularly since he was one of only three persons responsible for that important task. (Nipper Dep., 55). Special and general orders in such a small business obviously affected its "business operations to a substantial degree." After all, sales of inventory was the store's sole source of revenue. Brown exercised his authority to "commit" and "bind" the company each day when he made these purchases. See 29 C.F.R. § 541.202(b) (employee exercises independent judgment when he binds or commits business). Johnson testified that Brown had significant authority to bind and manage the store.

> Q. To what extent did Tom Brown have authority to, you know, to bind the company to make purchases on behalf of the company, to make directions on behalf of the company?
>
> Johnson. He had the authority he didn't have to ask to do the carports. He didn't have to ask to special order these parts everyday that we ordered all day long every day. He had the authority to tell Harold [Shultz] if he needed to make a delivery or not.
>
> Q. Okay. Those are all significant tasks in your mind?
>
> Johnson. Yes.

(Johnson Dep., 52).

As the testimony just quoted suggests, Brown's participation in the store's management involved both ordering merchandise and directing the work of a subordinate employee. Throughout his more than two and a half years with Nipper Auto Parts, Brown exercised supervisory authority over Shultz, the store's nonexempt employee. Brown regularly directed

Shultz to deliver parts and supplies to the store's commercial customers. (Brown Dep., 54; Johnson Dep., 52; Nipper Dep., 57). This involved discretion and independent judgment on Brown's part because he had to decide which customers were to receive the benefit of a delivery and the order of priority of those deliveries. While in the store, Shultz also was subject to Brown's direction and supervision. (Johnson Dep., 44). For example, Brown directed Shultz to clean the store on a daily basis.

> Q.         And did [Brown] have any supervisory authority over you?
>
> Shultz.    Yes, I guess.
>
> Q.         Did he tell you what to do?
>
> Shultz.    He'd tell me to mop, clean the floors, sweep the floors, bathroom, stuff like that.
>
> Q.         How often did he do that?
>
> Shultz.    Maybe once a day, twice a day.

(Shultz Dep., 6).

Unlike Shultz, who earned between $6.50 and $7.00 an hour during the years in question, Brown was treated as a member of the management team. (Nipper Dep., 58-59). Brown received occasional bonuses when the store as a whole exceeded revenue and expense targets. (Nipper Dep., 12-14). Brown was entrusted with a key to the store and allowed access at his own discretion. (Johnson Dep., 49-50; Nipper Dep., 56). Brown made recommendations to Nipper about running the business. (Nipper Dep., 40-42; 61-62). When Brown needed time off during the day to attend to his business in West Virginia or for myriad other personal reasons, he was allowed to leave the store.

> Q. So it is fair to say that if you needed to do something and leave you were allowed to leave?
>
> Brown. Yes.[4]

(Brown Dep., 41).

At the close of each day, Brown was responsible for counting the cash in the store register. He then had to verify that the cash matched the daily sales reports. Finally, he was responsible for leaving a set amount of cash in the register for the following morning. (Johnson, Dep., 39-40; 48-49). Like supervising Shultz and ordering merchandise, these are quintessential management functions in the retail setting.

In sum, Brown's "primary duty," as that term is defined by the Secretary, related directly to the management or general business operations of Nipper Auto Parts. "The term 'primary duty' means the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). While Brown also engaged in nonexempt work functions, his primary duty involved ordering merchandise, supervising Shultz and other exempt activities so that the store could operate profitably. 29 C.F.R. § 541.700(c) (explaining that "assistant managers in a retail establishment" who engage in exempt work "such as supervising and directing the work of other employees, ordering merchandise . . . may have management as their primary duty," even if they spend more than 50 percent of their time each day at the cash register). Particularly in view of the small size of Nipper Auto Parts, Brown's administrative

---

[4] Brown's salary was never docked when he took time off work. (Brown Dep., 40-41). He was also allowed to work on hobbies and other personal matters during the working day at Nipper Auto Parts, again with no deduction in his paycheck. For example, Brown during the business day at Nipper Auto Parts worked on paperwork for his business in West Virginia and drove his girlfriend's son to school in Narrows, Virginia. (Brown Dep., 36-39). In these and other respects, Brown was treated as a salaried member of management rather than as an hourly, nonexempt employee.

contributions to the financial success and business operations of the store certainly were important contributions to the business. Relative importance is a central consideration in assessing an employee's "primary duty." 29 C.F.R. § 541.700(a); *Stricker*, 935 F.Supp. at 658-59. See also Jones v. Virginia Oil Co., 69 Fed.Appx. 633, 637-38 (4th Cir. 2003) (granting employer's motion for summary judgment to claim by assistant manager/manager of combination Dairy Queen and convenience store who spent 75% of her time engaged in nonexempt work because the remaining 25% represented her exempt, "primary duty.").[5]

## II. ALTERNATIVELY, EVEN ASSUMING, <u>ARGUENDO</u>, THAT GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT FOR NIPPER AUTO PARTS ON THE MERITS, THE COURT SHOULD GRANT DEFENDANT PARTIAL SUMMARY JUDGMENT ON THE ISSUES OF LIQUIDATED DAMAGES AND THE APPLICABLE LIMITATIONS PERIOD.

Even assuming, arguendo, that genuine issues of material fact exist regarding Nipper Auto Parts' classification of Brown as exempt, the Court at a minimum should enter summary judgment for defendant on two of its affirmative defenses. First, the Court should grant Nipper Auto Parts summary judgment on Brown's demand for liquidated damages. Second, the Court should rule as a matter of law that the applicable limitations period is two years rather than three.

---

[5] Another relevant consideration under 29 C.F.R. § 541.700(a) is "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." Id. Here, the only nonexempt employee was Shultz, who worked 35 hours a week at a wage of between $6.50 to $7.00 an hour while Brown was with Nipper Auto Parts. This wage is considerably lower than Brown's salary of $460.00-$480.00 a week. Brown also received a few bonuses based on the store's overall performance. (Nipper Dep., 12-14).

A. Because Nipper Auto Parts Acted Reasonably In Good Faith, Liquidated Damages Are Inappropriate As A Matter Of Law.

The Court should dismiss Brown's claim for liquidated damages under 29 U.S.C. § 216(b). An award of liquidated damages is inappropriate as a matter of law when the Court finds that the employer's misclassification of an employee as exempt was either reasonable or in good faith. Mayhew v. Wells, 125 F.3d 216, 220 (4th Cir. 1997). The ultimate question is whether " . . . in the totality of these circumstances, it would be unfair to impose on [employer] more than a compensatory verdict." Id. at 221.

The totality of relevant circumstances make imposition of liquidated damages upon this family owned business unreasonable. Classifying Brown as an exempt, administrative employee was reasonable under case decisions by courts within the Fourth Circuit such as *Stricker*, 935 F.Supp. at 650. No evidence in the record suggests the Nippers acted in bad faith. Brown worked there for an extended period (November 2005 – July 2008) and never inquired or complained about the lack of overtime compensation. Brown and Nipper both have high school educations and own very small businesses. As president of a corporation, JBS Garage, Brown managed employees, issued IRS W-2 forms and otherwise acted as an employer while simultaneously working as an employee for Nipper Auto Parts. If Nipper failed to recognize Brown's nonexempt status, Brown made the same mistake. Imposing liquidated damages would be unjust under these circumstances.

B.  Because No Evidence Of Willfulness Exists, The Court Should Rule As A Matter Of Law That The Applicable Limitations Period Is Two Years.

Brown filed suit on September 22, 2008. He alleges in paragraph 17 of his Complaint that Nipper "willfully" denied him overtime compensation. Brown seeks damages for unpaid overtime compensation from November 2005 forward. The Court should rule that Brown's claim is partially time barred under 29 U.S.C. § 255(a) (FLSA action for unpaid overtime compensation must be "commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.").

Brown bears the burden of proving a willful violation. To establish willfulness, Brown must show Nipper Auto Parts must have known it had misclassified him or that the defendant acted with reckless disregard for the law. McLaughlin v. Richland Shoe Company, 486 U.S. 128, 130 (1988). A showing of ordinary negligence is insufficient. Id. at 133. Particularly since Brown never requested overtime compensation, he cannot show a willful refusal to pay an overtime premium on the part of this small employer. No basis, then, exists for the jury or the Court to find the requisite willfulness. Intracomm v. Bajaj, 492 F.3d 285, 296 and n. 9 (4th Cir. 2007) ("Given the ambiguity as to the regulation's application, we agree" with the district court's finding that employer's misclassification of employee as exempt was not willful.)

Conclusion

For the foregoing reasons, the Court should grant defendant Nipper Auto Parts and Supplies, Inc.'s Motion for Summary Judgment.

NIPPER AUTO PARTS AND
SUPPLIES, INC.


By:_____s/Paul G. Beers
        Of Counsel

Paul G. Beers (VSB # 26725)
Glenn, Feldmann, Darby & Goodlatte
37 Campbell Avenue, S.W.
P. O. Box 2887
Roanoke, Virginia 24001-2887
Telephone (540) 224-8035
Facsimile (540) 224-8050
Email: pbeers@gfdg.com

Counsel for the Defendant

## Certificate of Service

I hereby certify that on March 16, 2009, I electronically filed the foregoing Defendant's Memorandum in Support of Motion for Summary Judgment with the clerk of the Court using the CM/ECF system which will send notification of such filing to William C. Tucker, Esq., Butler, Williams & Skilling, P.C., 100 Shockoe Slip, 4th Floor, Richmond, Virginia 23219.

        _____s/Paul G. Beers
        Paul G. Beers